OPINION OF THE COURT
Gerald Sheindlin, J.
Upon completion of a hearing that some have referred to as the most comprehensive and extensive legal examination of *957 DNA forensic identification tests held to date in the United States, this court is called upon to rule on the admissibility of the DNA identification tests presented in this case.
The defendant stands accused of two counts of murder in the second degree, it being alleged that on February 5, 1987 he stabbed to death 20-year-old Vilma Ponce, who was 7 months pregnant at the time, and her 2-year-old daughter. A wristwatch worn by the defendant at the time of his arrest was seized. What appeared to be bloodstains on the watch were noted by the detectives. The defendant stated that the blood was his own.
The People, intending to prove at trial that the origin of the bloodstains on defendant’s wristwatch was the blood of the adult victim, and not the blood of the defendant, seek to introduce evidence of DNA identification tests.
This fascinating and novel issue has been dealt with in criminal proceedings on the trial level in this State (see, People v Wesley, 140 Misc 2d 306 [Albany County Ct 1988]; People v Lopez, NYLJ, Jan. 6, 1989, at 29, col 1 [Sup Ct, Queens County 1988]) but as no appellate court in this State has yet ruled on the admissibility of said procedures, this court ordered that a pretrial hearing be held in accordance with the teachings of Frye v United States (293 F 1013 [DC Cir 1923]) and People v Middleton (54 NY2d 42 [1981]) to determine the admissibility of new scientific evidence.
This hearing took place over a 12-week period producing a transcript of approximately 5,000 pages. It quickly developed into an intense and technical examination of DNA identification tests as applied to forensics and the methods employed by Lifecodes Corp. in this particular case.
Testifying for the prosecution were: Dr. Richard Roberts, Assistant Director of Cold Springs Harbor Laboratory, author of numerous peer review articles, declared to be an expert in molecular biology; Dr. Pablo Rubinstein, head of the immunogenetics laboratory at the New York Blood Center, author of 160 peer review articles, declared to be an expert in population genetics, genetics and conducting DNA procedures; Dr. Michael Baird, Director of Forensic and Paternity Testing, Lifecodes Corp., author of 60 peer review articles, declared to be an expert in genetics, molecular biology and population genetics; Dr. Carl Dobkin, research scientist in molecular biology for New York State, associate professor, Downstate Medical School, author of numerous peer review articles, *958 declared to be an expert in molecular biology; and Alan Giusti, physical scientist for the F.B.I., author of several peer review articles, declared to be an expert in DNA technology and testing procedures.
Testifyng for the defense were: Dr. Conrad Gilliam, Chief of the Molecular Genetics Unit, New York State Psychiatric Institute, assistant professor of neurogenetics, College of Physicians and Surgeons at Columbia University, author of numerous peer review articles, declared to be an expert in genetics and molecular genetics; Dr. Lorraine Flaherty, Chief of the Wadsworth Center and Director of the Kidney Disease Institute, author of 80 peer review articles, declared to be an expert in molecular genetics and quality control; Dr. Eric Lander, associate professor of math and statistics, Harvard University, Whitehead Fellow at Whitehead Institute for Biomedical Research at MIT, author of numerous peer review articles on DNA, declared to be an expert in genetics and population genetics; Dr. Phillip Green, human geneticist, Washington University School of Medicine, author of 40 peer review articles, declared to be an expert in genetics and population genetics; and Dr. Howard Cooke, scientist with Medical Research Council at University of Edinburgh, discoverer of "Cooke’s Probe” (also known as Cl and 29C1); author of numerous peer review articles on DNA, declared to be an expert in Cooke’s Probe.
THE LEGAL STANDARD OF ADMISSIBILITY
In determining the admissibility of novel scientific evidence, New York follows the rule as originally set forth in Frye v United States (293 F 1013 [DC Cir 1923], supra). There the court held: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” (Supra, at 1014.)
The Court of Appeals has explained the Frye standard as follows: "the test in not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable.” (People v Middleton, supra, at 49.)
*959 Of the few reported cases on the issue of DNA identification, this court is unaware of any case which has held the evidence to be inadmissible under Frye (supra).
In New York, three cases have dealt with this question: People v Wesley (supra), People v Lopez (supra), and Matter of Baby Girl S. (140 Misc 2d 299 [Sur Ct, NY County 1988]). In Wesley the court dealt exclusively with the issue of the Frye standards, while in Lopez and Baby Girl S. the evidence was deemed admissible. (Baby Girl S. did not pass on the Fyre issue, but relied on a statute construed by the court to permit DNA identification evidence to determine paternity.)
Additionally, in other States one appellate court found the evidence admissible under both the relevancy and Frye standards (Andrews v State, 533 So 2d 841, 847, n 6 [Fla Dist Ct App, 5th Dist 1988]), another has noted the introduction of this evidence without passing on the Frye issue (Yorke v State, 315 Md App 578, 556 A2d 230 [1989]). An unreported opinion of the Superior Court of Washington, dated January 18, 1989, has ruled the evidence admissible (State v Cauthron, index No. 88-1-1-012533). The Court of Criminal Appeals of Alabama has observed that at least nine States have admitted DNA evidence at trial (Kennedy v State, 545 So 2d 214 [1989]). Thus, all the available legal precedents agree that DNA forensic evidence is admissible, and none have held that this evidence fails to pass the Frye standard.
Due to the complex issues in this case, which were examined in such exquisite detail, the court will review the major aspects of the evidence presented. Further, the court has advanced the following three-prong analysis to aid in the evaluation and resolution of the issues presented:
Prong I. Is there a theory, which is generally accepted in the scientific community, which supports the conclusion that DNA forensic testing can produce reliable results?
Prong II. Are there techniques or experiments that currently exist that are capable of producing reliable results in DNA identification and which are generally accepted in the scientific community?
Prong III. Did the testing laboratory perform the accepted scientific techniques in analyzing the forensic samples in this particular case?
In dealing with DNA identification tests, some courts have considered all three questions as part of the inquiry under Frye (supra). (See, People v Lopez, supra; Andrews v State, *960 supra, at 843; Giannelli, Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum L Rev 1197, 1201 [1980].)
Others, in guarding the province of the trier of the facts, have indicated that the third question goes to the weight of the evidence not the admissibility under Frye. (See, People v Wesley, supra, at 317; State v Cauthron, supra; Giannelli, op. cit, at 1201-1202, nn 23, 24.)
It has been observed that: "Perhaps the most important flaw in the Frye test is that by focusing attention on the general acceptance issue, the test obscures critical problems in the use of a particular technique.” (Giannelli, op. cit., at 1226.)
The compelling logic of this observation leads this court to conclude that a different approach is required in this complex area of DNA identification. The focus of this controversy must be shifted. It must be centered around the resolution of the third prong.
It is the view of this court that given the complexity of the DNA multisystem identification tests and the powerful impact that they may have on a jury, passing muster under Frye (supra) alone is insufficient to place this type of evidence before a jury without a preliminary, critical examination of the actual testing procedures performed in a particular case. (See, Beeler and Wiebe, DNA Identification Tests and the Courts, 63 Wash L Rev 903, 936-937, nn 172-175 [1988].)
Accordingly, the first two prongs of the analysis deal strictly and exclusively with the Frye issue. The third prong is the subject of a pretrial hearing on the question of the admissibility of the particular evidence presented in this case.
PRONG I: THE THEORY
Is there a theory, which is generally accepted in the scientific community, which supports the conclusion that DNA forensic testing can produce reliable results? The evidence in this case clearly establishes unanimity amongst all the scientists and lawyers as well that DNA identification is capable of producing reliable results.
SCIENTIFIC BACKGROUND OF THE THEORY OF DNA IDENTIFICATION
A basic review of genetics and accompanying sciences is necessary in order to understand this sole area of unanimous agreement.
*961 DNA, deoxyribonucleic acid, is the fundamental natural material which determines the genetic characteristics of all life forms. Humans have human form and elephants have elephant form because of differences in the makeup of their respective DNA.
Every cell that contains a nucleus contains DNA. There are approximately 10 trillion cells in the human body and most contain DNA. Red blood cells, which do not have nuclei, are a significant exception. Although the DNA is much too small to be seen by even the most powerful microscope, if it were stretched out to its full length, it would be about six feet long. Within humans, as a species, much of the DNA is identical. It is this identity of DNA that makes all humans look like humans, rather than dogs or trees. We humans create human offspring by transferring our DNA to our children. The science of genetics studies how and why this happens.
DNA’s fundamental structure, however, does not vary regardless of the type of genetic creature it creates. DNA is composed of a long double helix, which looks like a spiral staircase. The backbone of this molecule (i.e., the handrails and balustrade of the staircase) consists of repeated sequences of phosphate and deoxyribose sugar. Attached to the sugar links in the backbone are four types of organic bases: adenine (A), guanine (G), cytosine (C) and thymine (T). The steps of the staircase are formed by pairs of these bases (hereinafter base pairs). A single DNA molecule consists of approximately three billion base pairs. Because of the chemical nature of the bases, only A and T can bond together, and only C and G can bond together. A cannot bond with G, and C cannot bond with T. Thus, the only possible combinations which can form the steps of the staircase are A-T, T-A, C-G, and G-C.
The sequence of the three billion base pairs along the handrails of the DNA is the key to the information represented by the DNA. This sequence is responsible for producing arms, legs, kidneys or brain cells.
Of this sequence, approximately three million sites vary from person to person.[1] There are enormous differences between individuals because of the manner in which the base pairs are arranged. These variations, called polymorphisms or anonymous sequence, occur in different regions of the DNA. *962 Polymorphisms are the basis of DNA identification. They are readily detectable when their lengths are altered by the action of restriction enzymes, thereby giving rise to "restriction fragment length polymorphisms” (hereinafter RFLP). The length of the fragment (or molecular weight) is measured by the distance it moves through an electrophoresis gel.
Each individual’s DNA is apportioned into 46 discrete sections within the nucleus of each cell. These sections are called chromosomes. Twenty-two of these chromosomes come from the mother and 22 come from the father. These are genetically arranged in pairs. Additionally, two sex-typing chromosomes, denominated "X” and "Y” are present.
During reproduction the chromosome pairs of the mother and the father split apart and then recombine — one chromosome from the mother and one chromosome from the father— to create the "new” 22 chromosome pairs of their child. Females have two "X” chromosomes, and males have one "X” and one "Y” chromosome, thus giving each human a total of 46 chromosomes.
A portion of DNA which is responsible for certain traits is called a gene (e.g., each person has a gene for the production of eyes). All humans have thousands of genes located on the 46 chromosomes. Each gene is located at a specific site, or locus, upon a specific chromosome. Alternate forms of genes are called alleles (e.g., blue-eyed allele, green-eyed allele). This total pool of genetic information is known as the human genome.
In chemical terms, the difference in alleles is explained by the difference in the ways the nucleotides, i.e., base pairs, arrange themselves along the DNA molecule. For example, one very short strand of DNA might look like:
A T T C
* * * *
T A A G
while another might look like:
A T A C
* * * *
T A T G
and a third might look like:
C A A T
* * * *
G T T A
All are slightly different. Each is an allele. In actuality, however, each allele is much longer, i.e., on the order of 1,000- *963 10,000 base pairs.[2] Each base pair consists of a single nucleotide, that one bond between A and T or C and G. However, a very small variation in the order in which these base pairs occur on the DNA molecule can make huge differences. Sickle-cell anemia, for example, is caused by a single base pair on a single chromosome occurring out of order. If that single aberrant base pair were placed properly, the afflicted would not suffer from the disease.
Obviously, if the DNA profile examined all three million sites of variation, each person’s DNA could be individualized. Such an undertaking would be unduly burdensome in terms of time, labor, and cost. As an alternative to this approach, it is accepted that scientists can, in relative terms, discriminate between various people’s DNA by examining several of these polymorphic sites. At a particular site or locus, a person may have a substantially unique pattern. For instance, a particular fragment size may occur in a small percentage of the population. By examining the sizes of a sufficient number of fragments at different sites on different chromosomes, statistical procedures permit enough discrimination to establish the unique configuration of any one person’s DNA pattern.
It has been noted: "There is nothing controversial about the theory underlying DNA typing. Indeed, this theory is so well accepted that its accuracy is unlikely even to be raised as an issue in hearings on the admissibility of the new tests * * * the theory has been repeatedly put to the test and has successfully predicted subsequent observations”. (Thompson and Ford, DNA Typing: Acceptance and Weight of the New Genetic Identification Tests, 75 Va L Rev 45, 60-61 [1989].)
Thus, it is clear that there is general scientific acceptance of the theory underlying DNA identification.
PRONG II: THE TECHNIQUES AND EXPERIMENTS
Are there techniques and experiments that currently exist that are capable of producing reliable results in DNA identification and which are generally accepted in the scientific community?
To fully understand the second prong, it is noted that the techniques and experiments performed in this case are not novel or recently discovered. They have been in use in labora *964 tories conducting DNA analysis in diagnostics, clinical and experimental settings for years. All of the procedures have gained general scientific acceptance.[3] It is the transfer of this technology to DNA forensic identification that has generated much of the dispute.
There are eight separate scientific procedures or experiments which are conducted. The first six procedures are known as "Southern Blotting”. The seventh and eighth procedures (interpretation and population genetics) are also well *965 known and accepted in the scientific community, but do present special problems when dealing the DNA forensic identification issues.[4]
The eight procedures are as follows: (1) digestion of DNA into fragments by restriction enzymes creating RFLPs; (2) separation of the DNA fragments by electrophoresis; (3) staining the separate fragments with ethidium bromide so that they can be illuminated by ultraviolet exposure; (4) denaturing, or separating the two DNA strands, and fixing them to a nylon membrane; (5) hybridization of the single strand of DNA by marking it at a specific location with a radioactive probe; and (6) reproducing a picture of the radioactively marked DNA. onto an X-ray film — or autoradiograph or auto-rad; (7) interpretation of autorads; (8) population genetics, if necessary. The court will briefly discuss each step.
Digestion: After the DNA is extracted from the nucleus of the cells, it is separated — or digested — into fragments by the application of a restriction enzyme. A restriction enzyme is a protein which chemically cuts a DNA molecule at a specific site. For example, the restriction enzyme known as Providentia Stuarti No. 1 (PST-1) recognizes the base pair sequence CTGCAG and cuts the DNA between the A and G nucleotide. Thus, this enzyme will cut the DNA molecule at this specific "A-G” point at all places throughout the entire three billion base pairs in which the six base pair sequence occurs. In that portion of the genome that is known and mapped, the restriction enzyme will cut everyone’s DNA in the same place, resulting in DNA fragments which are substantially the same length. In the anonymous or polymorphic sequence, where there are vast differences in the way the base pairs are arranged, there will be great differences in the length of the fragment because of the varying number of base pairs that lie between the cutting points that the restriction enzyme selects. These varying numbers of base pairs are known as "variable number of tandem repeats” or repeat sequences of DNA base pairs which vary in length. They are called VNTRs for short. The varying lengths of fragments produced by VNTRs, after the DNA is cut by the restriction enzyme, are known as "restriction fragment length polymorphisms”, or RFLPs. In layman’s terms, this means that RFLPs are fragments which have a different length because each RFLP has a variable number or VNTRs within its length.
*966 Electrophoresis: Once the DNA has been digested into RFLPs, the RFLPs must be separated and sorted in order to measure them. This is accomplished by gel electrophoresis. In this process, an agarose gel, a "Jell-0”-like substance, is placed in a weak electric field, positive at one end and negative at the other. The RFLPs are then loaded into the negative end of the gel. They flow toward the positive end of the gel because DNA has a negative electrical charge. The agarose gel is composed of holes of varying size. As a result, the fragments of DNA become trapped along the way as they try to reach the end of the gel. The larger RFLPs, being less flexible and agile, tend to get trapped at the top of the gel. The smaller RFLPs tend to migrate towards the bottom of the gel. Once the DNA strands have been trapped, they can be sorted by length and measured.
Ethidium Bromide Staining: To mark the RFLPs for further measurement the entire gel is treated with ethidium bromide. All of the DNA absorbs the stain and glows when placed in ultraviolet light. Thus, it is possible to determine where the DNA is located on the gel and to photograph its positions.
Denaturation and Blotting: After the RFLPs have been stained for recognition, they are then denatured. This chemical process splits the fragments of the DNA molecule into two separate strands. Thus, rather than being bonded together and looking like:
A C T G
* * * *
T G A C
the DNA under examination now looks like:
A C T G
T G A C
These single strands are then transferred from the malleable gel surface onto the firm surface of a nylon membrane. The RFLPs are now permanently fixed in their respective positions.
Hybridization: Hybridization marks the strands for identification measurement. To do this, radioactively marked probes which recognize specific DNA sequences are utilized. These probes, which consist of single strands of DNA, are contained in solutions into which the membrane is placed. The probe will attach to its fixed complementary strand. For example, if the probe DNA sequence is ACTG, it will find and bind to the TGAC sequence contained on the membrane. If there is no *967 such sequence on the membrane, it will not bind with anything. After a sufficient immersion period, which varies with the nature of the probe, the membrane is removed and photographed. This process can be repeated by washing the membrane chemically and then rehybridizing it with another probe. Any excess and unused probe is washed off so that all remaining probes will have attached to its fixed complementary strand.
Creation of the Autoradiograph: After the radioactively marked membrane is removed from the hybridization solution, it is placed on an X-ray film and exposed for a variable period of time.
The radioactive probes which have attached to DNA on the membrane produce an image on the autorad which corresponds to its position on the membrane.
Interpretation of Autorads: After the autorad has been produced the results must be interpreted. The bands on the autorad in different lanes must be examined to determine if they "match”. The bands in various lanes on the autorad are visually inspected to see if they comigrate. If a match is declared, the issue is reduced to determining the likelihood that the match is unique. A match is said to occur if the sizes and number of the detected RFLPs in various lanes are indistinguishable within a permissible degree of error. They are then measured either manually or by a digitizer attached to a computer. Whatever standard of measuring error is used to determine if the bands are indistinguishable must also be used when calculating the frequency of the band in the population.
The "uniqueness” question is answered according to the principles of population genetics, using the same matching rule or standard deviation.
Population Genetics: The population geneticist determines the frequency with which a specific allele occurs within a given human racial group. In the case of a common allele, for example the Rh positive blood types, the frequency of occurrences in the human population is quite large. Thus, if both DNA samples show the Rh positive allele, the population geneticist can say only that both samples could have come from any person, male or female, who is part of the majority of the human population. In the case of the Rh negative allele, the population geneticist can say that the allele is somewhat rarer and that the samples come from a minority of *968 the human population. In the case of alleles that occur in the anonymous or polymorphic section of the genome the likelihood that the samples will match is much smaller. This reduced likelihood of matches is what gives DNA identification technology its value for forensic purposes.
Population genetics derives its force for identification purposes from the small likelihood that a given polymorphic or anonymous allele will occur randomly in the relevant racial population. For the alleles to be random in the gene pool two preconditions must exist. First, the occurrences of the allele must not be caused by linkage disequilibrium, and second, the relevant racial population as a whole must be in Hardy-Weinberg equilibrium. For these purposes, a population is in equilibrium when there is no correlation between the allele contributed by the mother and the allele contributed by the father at a particular locus. That is, the alleles are independent of each other. Thus, when two alleles under examination appear on a single chromosome of the parent, the chance that the child received both alleles randomly is lessened. The reason for this is that there is an increased chance that alleles on a single chromosome will be passed on together and then become part of the child’s genome. This is more likely than if the alleles were located on different chromosomes. Hence, there is less chance that the alleles were transmitted randomly. When this phenomenon occurs the alleles are linked, and for this allele the population is in linkage disequilibrium.[5] Where the alleles occur on different chromosomes, linkage is not expected to occur except due to external forces of nature. Where there is no linkage the appearance of the allele in a child may be said to have occurred randomly. When this occurs, the population is not in linkage disequilibrium.
For purposes of Hardy-Weinberg equilibrium it is assumed that allele frequencies will remain constant within a population from generation to generation as long as mating remains random. The Hardy-Weinberg principle is expressed algebraicly as P2+2PQ+Q[2]=1, where P and Q are the percentage of the population having two different alleles. Where, for example, P and Q are Rh positive and Rh negative blood types, respectively, and where Rh positive blood is seen in 60% of the population and Rh negative blood is seen in 40% *969 of the population, the equation tells us that P[2]=.36, 2PQ=.48, and Q[2]=.16. Since these numbers total 1, the population is in Hardy-W einberg equilibrium for these alleles.
To determine the frequency with which a given allele observed on an individual’s DNA occurs in a population which is in equilibrium, the scientist consults the data base. Where three or four rare alleles occur in a single DNA sample, the frequency with which each occurs is multiplied by the frequency of occurrences of the others. The result can be a large number, say 1 in 10,000,000. Obviously, then, if this is the conclusion reached by the population geneticist, the likelihood that the DNA samples came from the same individual is all but certainly established. It is for this reason that DNA identification technology can be of enormous value for forensic purposes.
However, if the population is not in Hardy-W einberg equilibrium then the alleles are not independent. Thus, the degree of dependency between the alleles must be calculated. Calculations may also be obtained by finding the actual, not projected, frequency in the population. This may be accomplished using larger populations, reference populations to determine genotype frequencies, or by considering only one allele. Conservative or reduced calculations may also correct the Hardy-Weinberg deviation problems.[6] With deviations from Hardy-Weinberg equilibrium the frequency of the allele in the population, and thus the uniqueness of the fingerprint, can be in question but this is not necessarily related to the validity of the match.
ADDITIONAL EXPERIMENTS, TECHNIQUES AND CONTROLS
The scientific evidence in this case demonstrates that additional experiments and controls may be necessary, when the scientist is confronted with contaminated and degraded DNA, in order to insure reliable results.
When scientists use Southern Blots for clinical or diagnostic purposes they use fresh or dried blood samples from a known source. Thus, if a particular experiment gives an uninterpretable result, the scientist need only obtain more blood from the patient and reperform the experiment. In forensic cases, however, the sample — say a bloodstain found at a crime scene, or a semen sample obtained from a rape victim — is limited. If the experiment goes awry, there is no way to redo it. Thus, for *970 forensic purposes, there is only one bite of the apple. The forensic scientist must take special pains to be sure that proper controls were utilized to ensure that the experiment was performed correctly. Additionally, forensic samples are frequently contaminated by material which mixes with the blood at the scene, or by bacteria which grows in the sample. If these contaminants contain DNA, that DNA will show on the autoradiograph along with the human DNA. Thus, the forensic scientist must also have a method for determining which DNA is human and which DNA is nonhuman. Unlike the clinical scientist who can simply obtain more sample which is uncontaminated, the forensic scientist must make the best interpretation possible with what is available.
The forensic scientist also faces problems in interpreting the autoradiograph which clinical scientists do not. The clinical scientist knows who the subject is and can obtain blood samples from the subject’s parents. Thus, the clinical scientist can run lanes of the subject’s parents’ DNA alongside that of the subject. This procedure allows for relative certainty in measuring the kilobase size of a given allele. Since the allele in question must have been transmitted to the subject by one of the parents, a comparison of the three DNA samples can resolve ambiguities about whether one allele in fact matches another. The forensic scientist does not have this luxury. The forensic sample comes from an unknown source whose parent can be anybody in the world. Thus, the forensic scientist must use other means to resolve ambiguities, or face the fact that the autoradiograph is uninterpretable and the evidence is rendered worthless.
The scientific evidence in this case indicates that additional experiments and controls must be considered and, if necessary, performed to insure reliable results when seeking to declare a match or an exclusion where alleles are closely aligned. A discussion of each of these suggested techniques follows:
1) Mixing experiment: Because lanes of DNA may not run exactly the same during electrophoresis, a mixing experiment should be conducted when there is sufficient quantity of DNA available. The technique is simple and scientifically accepted. A sample (x) is placed in lane A, a 50-50 mixture of sample x and sample y is run in lane B and sample y is run in lane C. The fragments should give identical patterns on a Southern Blot on all three lanes.
*971 2) Serial Dilution: Where there is a high concentration of DNA when compared with another sample it will result in much more intense bands thereby creating a large band difficult to identify and measure. Accordingly, the high concentration of DNA should be run in 3 or 4 lanes with different quantities of DNA to insure the display of bands of different intensities. This would allow the scientist interpreting the autorad to measure the varying intensities with the companion lane also containing a less intense bánd. This process will insure a more accurate measurement of the molecular weight of each of the samples.
3) Nonpolymorphic Probe: Nonpolymorphic probes hybridize to loci which are present in most of the population, i.e., they hybridize to areas in the genome in which everybody’s DNA is the same. For this reason, they are of comparatively little use for forensic purposes because they do not demonstrate differences between individuals. In the case of D2S44, however, a nonpolymorphic probe which recognized a human band anywhere above 10.25Kb could have been used to determine whether the DNA had degraded. If, for example, a nonpolymorphic probe which recognizes a locus at 13Kb had revealed a band at that level, the scientist can conclude that sufficient high molecular weight DNA existed above 10.25Kb to have caused a heterozygous band to light up at D2S44 if, in fact, the victim was not homozygous. (See, 974-975 herein).
4) Synthetic Probes: DNA probes may be either synthetic or nonsynthetic. The difference lies in how they are manufactured. A nonsynthetic probe is created by the insertion of a piece of human DNA into a bacterial vector where it grows, or clones, into a sample that can be used for probe purposes. A synthetic probe is manufactured by using a nucleic acid synthesizer to create DNA by arranging base pairs into the desired sequence. The difference is important because DNA grown in plasmid can become contaminated with the bacterial DNA in which it grows. When such contaminated DNA is used as a probe in hybridization, it will bind to any bacterial DNA as well as the human DNA which is present on the membrane. On the other hand, synthetic DNA, having been created in a nonbacterial environment, will hybridize only with human DNA. The result is that when a synthetic probe is used, the autoradiograph will show bands that are of human origin only while hybridization with a nonsynthetic probe may show both bacterial and human bands.
*972 5) Male and Female DNA in Control Lane when Examining Sex Chromosomes: As previously noted, males have a "Y” chromosome while females do not. To control for this phenomenon, control lanes of known male and female DNA should be run in each gel when the sex of the test DNA is in issue. When a hybridization for the "Y” chromosome is done, the scientist can determine whether the presence or absence of the "Y” chromosome in the test DNA is valid by looking at the sex control lanes. This control should be used in forensic cases when the sex of the test DNA’s donor is unknown as was the circumstance of the watch DNA in this case. It is noted that this control was not performed in this case.
6) The Matching Rule: The method to be used, as revealed by the evidence in this case, can be conducted by first visually determining if the bands appear to comigrate. This apparent match should be insured by objective quantitative measurements. If the quantitative measurements confirm the visual match then a match may be declared to the extent that a scientist would be permitted to declare that the bands appear to be indistinguishable.
The court notes that Dr. Roberts, Dr. Green and Dr. Lander all testified that the methods for declaring matches must be consistent and that no scientist should employ one method for declaring a match on an autorad and then use a different method when examining the allele data bank for population genetics. The rule for declaring a measured match must be the same rule which is used for declaring a match between the measurements and the data pool.
This court concludes that the credible scientific evidence in this case supports the conclusion that DNA forensic identification evidence meets the Frye standard. Indeed, the court opinion is supported by Dr. Roberts, Dr. Dobkin, Dr. Rubinstein and Dr. Baird. Additionally, Dr. Lander and Dr. Flaherty have both acknowledged that the status of DNA identification will be in a position to generate reliable results in approximately six months. This opinion can only be valid if all of the techniques discussed herein have been and are currently recognized as acceptable in the general scientific community for producing reliable results in DNA forensic identification. No new tests or experiments or procedures were recommended or even acknowledged to exist. Accordingly, to breathe any meaning into the opinion of these highly respected and rather *973 brilliant scientists one must conclude that the test is presently reliable and will remain so for the next six months.
Therefore, it is the conclusion of this court that DNA forensic identification tests to determine inclusions are reliable and meet the Frye standard of admissibility.
EXCLUSIONS
Because the scientific method for determining whether two samples of DNA do not match and, therefore, are genetically different, is less complex in its analysis, it is equally clear that DNA forensic evidence establishing an exclusion is reliable. It is noted that if two samples of DNA do not comigrate by a significant margin the autorad can be interpreted merely by visual means and population genetics is not involved as would be the case when declaring a match. If the bands are not significantly separated then quantitative measurements may be employed to confirm the visual exclusion. Again; it is noted that population genetics is not involved in this calculation.
Accordingly, this court concludes that DNA forensic identification tests to determine exclusion are reliable and meet the Frye standard of admissibility.
PRONG III: PRETRIAL HEARING
"A scientist may have no trouble accepting the general proposition that DNA typing can be done reliably, yet still have doubts about the reliability of the test being performed by a particular laboratory.” (Thompson and Ford, DNA Typing: Acceptance and Weight of the New Genetic Tests, 75 Va L Rev 45, 57-58.)
The third prong is the subject of a pretrial hearing to determine if the testing laboratory performed the accepted scientific techniques in analyzing the forensic samples in this particular case.
The court notes that the autorads produced firmly memorialize the experiments conducted. Therefore, they can be reviewed, in an adversarial proceeding, to insure that the proper scientific procedures were performed.
Although it was noted in People v Wesley[7] (140 Misc 2d 306, *974 supra) and People v Lopez[8] (NYLJ, Jan. 6, 1989, at 29, col 1, supra) that improper procedures and experiments will automatically and clearly be revealed, this court, on the contrary, advises caution in reviewing the procedures. For example, contaminated samples, probes or controls, may produce extra bands on the autorads which can cause differing scientific opinions in the interpretation of the autorads. On the other hand, degradation of a sample may fail to produce a band, again resulting in interpretation problems. Clearly, these noted problems require further experiments and autorads to be produced, to insure reliability as hereinafter noted.
In a piercing attack upon each molecule of evidence presented, the defense was successful in demonstrating to this court that the testing laboratory failed in its responsibility to perform the accepted scientific techniques and experiments in several major respects.
The complex analysis of the major defects in this case will be separated by the various chromosomes examined and the resulting autorads produced.
A. Inclusions
1. Cocktail Hybridization of D2S44 and D17S79 and Autorad 17;[9] Autorads 2, 4, 7, 8, 9 and 10[10]
Autorad 17 indicated a band at about the 6Kb level on lane 2662 (the deceased). In an attempt to explain the origin of the 6Kb band, the membrane was rehybridized with rDNA, a bacterial probe and bluescribe, a plasmid (autorads 7, 8, 9 and 10).[11] It is initially noted that the use of the contaminated probe is unscientific and unacceptable. Immediately upon discovering a contaminated probe its use should have been discontinued. However, the tests used to explain away the 6Kb band by autorads 2 and 4 involving nonsynthetic probes for *975 D2S44 and D17S79 did not react with the 6Kb band. This indicated that the 6Kb band was not part of either loci. A third hybridization with a bacterial and bluescribe plasmid probe did show the band at 6Kb in autorads 7 and 8. Thus, while autorad 17 is unreliable by itself, when it is read in conjunction with autorads 2 and 4, it does yield sufficiently reliable results to create a question of fact for the jury. Autorad 17, as it relates to D2S44, revealed a homozygous band at about 10.25Kb in both the watch lane (2617) and the lane of the deceased (2662). Because the DNA on the watch was degraded, i.e., eaten by bacteria, some question arises whether the blood DNA on the watch revealed a true homozygous band or a heterozygous band which appears homozygous because the upper band had degraded away. Utilization of a nonpolymorphic probe is essential in answering this question.
As noted in Prong II, these tests exist and are scientifically accepted. The evidence in this case created a sharply divided scientific opinion as to the value of these autorads because of the failure to conduct experiments with a nonpolymorphic probe. The court notes that other experiments could have been conducted to resolve the ambiguities relating to the 6Kb band on D17S79 and to the DNA band at about 10.25Kb at D2S44. However, because the testimony of the expert scientists demonstrated conflicting opinions, again an issue of fact was created which would have been submitted to the jury with appropriate instructions by the court.
2) DYZ1 Hybridization and Autorads 11 and 12
Autoradiographs 11 and 12 reflect two different exposures of a hybridization with DYZ1. The purpose of this experiment was to determine the sex of the watch lane sample and it failed to produce a reliable result. Dr. Lander testified that no reputable lab would ever consider doing sex typing unless both positive (male) and negative (female) controls were employed. In the absence of both controls, it is difficult to determine whether the probe hybridized correctly. The failure to include both controls renders the experiment uninterpretable. The fact that another autoradiograph (a different gel from a different case with a male sample) was hybridized the same day should not replace the correct, recognized scientific procedure.
3) DXYS14 and Autorad 5
Autoradiograph 5 displays the DXYS14 hybridization utilizing a probe known in the literature as' 29C-1 or "Cooke’s *976 Probe” named after Dr. Howard Cooke, the scientist who first developed it and who testified at this hearing. This hybridization shows three bands in lane 2662 (the victim) and five bands in lane 2617 (the watch lane). The three bands in both the victim’s lane and the watch lane appeared to comigrate with each other and were designated bands "1”, "2”, and "3”; the two bands that were in the watch lane but not in the victim’s lane were designated bands "A” and "B”. The existence of bands A and B are of critical importance in determining whether the forensic DNA testing performed in this case demonstrates these bands to be human DNA or nonhuman DNA. If bands A and B were of human origin then one would have to conclude that the DNA in lane 2662 (the victim) and the DNA in lane 2617 (the watch lane) came from different sources. The observations that A and B were "most likely bacterial or plasmid” bands were not supported by the experiments conducted to identify plasmid and ribosomal bacteria bands (autoradiographs 8, 9, and 10) as these experiments failed to light up any bands in the A and B position.
Further testing was required before a reliable judgment could be made as to whether there was or was not a match at this loci. The credible evidence by almost all of the scientists who testified at this hearing established that the membrane should have been rehybridized with DXYS14 to see if band A and B reappeared. Experiments with bacterial and plasmid probes should have been conducted to see if bands A and B were contaminants. The autorads could have been exposed for a longer period, rather than overnight. A serial dilution might have been appropriate. These experiments were not performed and cannot be performed now. As a result, the evidence is insufficient to determine, with reasonable scientific certainty, whether lane 2662 (victim’s blood) and lane 2617 (the watch blood) match at this locus. At this locus, the evidence is inconclusive. Accordingly, the DNA identification evidence should not be admissible at trial on the issue of whether the victim’s blood does or does not match the blood on the watch.[12]
Because of these errors relating to DXYS14, the evidence as *977 to all three chromosomes are inadmissible to declare a match. Both sides concede this point.
Accordingly, the credible testimony having clearly established that the testing laboratory failed to conduct the necessary and scientifically accepted tests, the evidence demonstrating an inclusion is inadmissible as a matter of law.
4) Population Genetics
The method by which the scientist declares that two bands match for purposes of population genetics also merits discussion.
Since the court is precluding the evidence of inclusion because of the unresolved ambiguities, any population genetics question need not be resolved in detail by this court. Because much of the evidence at the hearing centered on these issues, however, the court will review Lifecodes’ practices in the area of population genetics. The court agrees with Drs. Roberts, Green, and Lander that the methods for declaring matches must be consistent and that no scientist should employ one method for declaring a match on an autoradiograph and then use a different method when examining the allele data bank for population genetic purposes. Lifecodes declares a match by visual observation in a blind reading of the autoradiograph. This appears to be accepted by the scientific .community. The court accepts that scientists can properly declare a match visually on an autoradiograph, quantify that match by computerized measurement, and then compare those measurements to the data pool. The quantitative measurements should confirm the visual match. If they do not, and it is unexplained, an exclusion should be announced. If the measurements confirm the visual match, the evaluation of the frequency of the allele in the population will be conducted, using an acceptable data pool.
The rule for declaring a measured match must be the same rule which is used for declaring a match between the measurements and the data pool. This was not done in this case.[13] Because of this error, the population frequencies reported by Lifecodes in this case are not generally accepted by the *978 scientific community. This mistake might have been corrected by remeasuring the bands, rematching them to the data pool, and then recalculating the allele frequencies. However, this procedure was not undertaken in this case. Accordingly, the statistical probabilities noted would have been precluded or substantially reduced (People v Mountain, 66 NY2d 197 [1985]; People v Wesley, 140 Misc 2d 306, 330, supra).
B) Exclusions: D2S44, D17S79, DXYS14 and Autorads 13, 14 and 15
The autoradiographs produced in this case all clearly demonstrate that at the loci D2S44, D17S79, and DXYS14, the blood of the defendant on gel 261 shows bands at locations distinctly different from those in the blood found in the watch lane on gel 7501. Accordingly, the defendant is excluded as the source of the blood.
There is no dispute among the expert witnesses that Life-codes’ autoradiographs demonstrate an exclusion of the defendant as the source of the blood on the watch. The evidence demonstrates that the experiments which Lifecodes performed are reliable for this purpose. Hence, the court concludes that the DNA identification evidence of exclusion should be admitted at this trial. Because this evidence demonstrates an exclusion, no questions relating to allele frequencies in the population need be considered.
SUGGESTED PROCEDURES FOR PRONG III DNA HEARINGS
A pretrial hearing should be conducted to determine if the experiments and calculations performed by the testing laboratory in the particular case yielded results sufficiently reliable to be presented to the jury (see, People v Mountain, supra). This hearing will also serve to aid the Trial Judge in formulating appropriate instructions to the jury in the event sharp issues of fact emerge from the hearing.
Of course, the Judge may also preclude the evidence, as a matter of law, if the evidence reveals that the testing laboratory failed to substantially comply with the scientifically accepted tests and procedures.
The following pretrial hearing procedures are suggested:
1. Notice of intent to offer DNA evidence should be served as soon as practicable.
2. The proponent, whether defense or prosecution, must give discovery to the adversary, which must include: (1) Copies of *979 autorads, with the opportunity to examine the originals. (2) Copies of laboratory books. (3) Copies of quality control tests run on material utilized. (4) Copies of reports by the testing laboratory issued to proponent. (5) A written report by the testing laboratory setting forth the method used to declare a match or nonmatch, with actual size measurements, and mean or average size measurement, if applicable, together with standard deviation used. (6) A statement by the testing lab, setting forth the method used to calculate the allele frequency in the relevant population. (7) A copy of the data pool for each loci examined. (8) A certification by the testing lab that the same rule used to declare a match was used to determine the allele frequency in the population. (9) A statement setting forth obsérved contaminants, the reasons therefore, and tests performed to determine the origin and the results thereof. (10) If the sample is degraded, a statement setting forth the test performed and the results thereof. (11) A statement setting forth any other observed defects or laboratory errors, the reasons therefore and the results thereof. (12) Chain of custody documents.
3. The proponent shall have the burden of going forward to establish that the tests and calculations were properly conducted. Once this burden is met, the ultimate burden of proof shifts to the adversary to prove, by a preponderance of the evidence, that the tests and calculations should be suppressed or modified. (See, People v Nieves, 143 Misc 2d 734 [Crim Ct, NY County 1989, Leibovitz, J.].)
It is noted that issues of fact which arise as a result of the hearing concerning the reliability of any particular test, or the size or ratio of the population frequency, relates to the weight of the evidence and not its admissibility. However, where the results are so unreliable, as was demonstrated in this case, the results are inadmissible as a matter of law.
CONCLUSION
1) There is general scientific acceptance of the theory underlying DNA identification.
2) DNA forensic identification techniques and experiments are generally accepted in the scientific community and can produce reliable results. Hence, the Frye standard of admissibility is satisfied.
3) A pretrial hearing should be conducted to determine if the testing laboratory substantially performed the scientifi *980 cally accepted tests and techniques, yielding sufficiently reliable results to be admissible as a question of fact for the jury.
4) After a pretrial hearing in this case, the DNA identification evidence of exclusion is deemed admissible as a question of fact for the jury. The testing laboratory did substantially perform the scientifically accepted tests thereby obtaining sufficiently reliable results, within a reasonable degree of scientific certainty.
5) After a pretrial hearing in this case, the DNA identification evidence of inclusion is deemed inadmissible, as a matter of law. The testing laboratory failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty.

. Identical twins are the exception to this statement. Since they are both the product of a single union between one egg and one sperm cell, the twins’ DNA is identical.

. Base pairs are usually expressed as kilobases (or Kb). A. kilobase is 1,000 base pairs.

. Jeffreys, Wilson, Thein, Weatherall & Ponder, DNA "Fingerprints” and Segregation Analysis of Multiple Markers in Human Pedigrees, Am J Human Genetics 39:11-24 (1986); Wong, Wilson, Jeffreys & Thein, Cloning a Selected Fragment From a Human DNA Fingerprint: Isolation of an Extremely Polymorphic Minisatellite, 14 (No. 11) Nucleic Acids Research (1986); Gill, Lygo, Fowler & Werrett, An Evaluation of DNA Fingerprinting for Forensic Purposes, 8 (No. 38-44) Electrophoresis (1987); Gill, Jeffreys & Werrett, Forensic Application of DNA Fingerprints, 318 Nature 577-579 (1985); Dodd, DNA Fingerprinting in Matters of Family and Crime, 318 Nature 506-507 (1985); Jeffreys, Wilson and Thein, Individual-Specific "Fingerprints of Human DNA”, 316 Nature 76-79 (1985); Kanter, Baird, Shaler and Balazs, Analysis of RFLPs in DNA Recovered from Dried Blood Stains, 31 (No. 2) J of Forensic Sciences 403-408 [1986]; Giusti, Baird, Pasquale, Balazs and Glassberg, Application of DNA Polymorphisms to the Analysis of DNA Recovered from Sperm, 31 (No. 2) J of Forensic Sciences 409-417 (1986); McNally, Shaler, Giusti, Baird, Balazs, DeForest and Kobilinsky, The Effects of Environment and Substrata on DNA: The Use of Case Work Samples from New York City, J of Forensic Sciences (Sept. 1989); McNally, Shaler, Giusti, Baird, Balazs, DeForest and Kobilinsky, Evaluation of DNA Isolated From Human Blood Stains Exposed to Ultra Light, Heat, Humidity and Soil Contamination, J of Forensic Sciences (Sept. 1989); Nakamura, Lathrop, O’Connell, Leppert, Barker, Wright, Skolnick, Kondoleon, Litt, Lalovel and White, A Mapped Set of DNA Markers for Human Chromosome 17, 2 Genomics 302-309 (1988); Baird, Giusti, Meade, Clyne, Shaler, Benn, Glass-berg and Balazs, The Application of DNA-Print for Identification From Forensic Biological Materials, 2 Advances in Forensic Haemogenetics 396-402 (1988); Nakamura, Leppert, O’Connell, Wolff, Holm, Culver, Martin, Fujimoto, Hoff, Kumlin and White, Variable Number of Tandem Repeat (VNTR) Markers for Human Gene Mapping, 235 Science 1616-1622 (1987); Baird, Balazs, Giusti, Miyazaki, Nicholas, Wexler, Kanter, Glassberg, Allen, Rubinstein and Sussman, Allele Frequency Distribution of Two Highly Polymorphic DNA Sequence in Three Ethnic Groups and Its Application to the Determination of Paternity, 39 Am J Human Genetics 489-501 (1986); Baird, Wexler, Clyne, Meade, Ratzlaff, Smalls, Benn, Glassberg and Balazs, The Application of DNA-Print for the Estimation of Paternity, 2 Advances in Forensic Haemogenetics 354-358 (1988); Balazs, Baird, Clyne and Meade, Human Population Genetic Studies of Five Hypervariable DNA Loci, 44 Am J Human Genetics 182-190 (1989) (this article has generated significant criticism); Morris, Sanda and Glassberg, Biostatistical Evaluation of Evidence from Continuous Allele Frequency Distribution DNA Probes in Reference to Disputed Paternity and Disputed Identity, J of Forensic Sciences (1989).

. See discussion under Prong III.

. This complicated concept is expressed as a double negative, to wit: The allele must not be in linkage disequilibrium. Another method to express this concept is to note if the population is in linkage equilibrium.

. People v Wesley, 140 Misc 2d 306, 330.

. 140 Misc 2d 306, 320 ("if the test, or any of its steps were performed improperly, no result at all would be registered — in other words the autoradiograph would be blank”).

. NYLJ, Jan. 6, 1989, at 29, col 1, col 4 ("certain controls were built into the system ** * * to make sure the tests were performed correctly. * * * [I]f the test [were] performed improperly there would be no result”). For a similar observation, see Andrews v State (533 So 2d 841, 890).

. A cocktail hybridization is a hybridization with 2 or more probes that recognize specific sequences in 2 or more chromosomes; in this case, the 2nd and 17th chromosomes.

. The autorad numbers conform partially to the evidentiary numbers assigned in this case.

. Autorad 10 attempted to show whether the 6Kb band was bluescribe plasmid. However, this experiment failed when the control lane containing pure human DNA lit up. This unusual occurrence was due fo contamination of the probe or the control lane.

. Dr. Roberts and Dr. Dobkin testified for the prosecution. In substance, they testified that DNA identification results are reliable. They both were recalled by the defense and testified, in substance, that the tests conducted relative to DXYS14 were inconclusive because of the testing laboratory’s failure to conduct further testing. Dr. Lander and Dr. Flaherty offered similar testimony.

. Lifecodes’ measurement of error consisting of 3 standard deviations from the mean of the alleles has been observed to be really 6 standard deviations from each of the measured fragments, a dubious standard of deviation. Further, whatever standard of deviation that was used by Life-codes, it is clear that Lifecodes failed to use the same measurement in calculating the frequency of the alleles in the population. As noted, this is scientifically unacceptable.