OPINION OF THE COURT
Nicholas Colabella, J.
May a technological advance in the nature of DNA analysis of physical evidence nine years after a crime justify vacating a conviction for that crime and dismissing the underlying indict *672 ment. In a case of apparent first impression in the State, the court answers in the affirmative.[1]
I
On April 10, 1984, defendant was convicted of rape in the first degree and sentenced to 12 to 25 years. The judgment, in turn, was affirmed in June 1988, by a unanimous bench of the Appellate Division (People v Dabbs, 141 AD2d 664).
The facts of the crime are brutal and undisputed. At around 3:30 a.m., on August 12, 1982, the victim was attacked from behind as she walked home and forcibly dragged into an alleyway between a warehouse and another building. While being dragged up a flight of stairs, she was dropped and struck in the head, causing her to lose consciousness momentarily. When she regained awareness she observed three assailants. One held her arms, one held her legs, one stood between her legs. As she struggled to free herself, the man between her legs slapped her, bringing his face within inches of hers. He then proceeded to rape her. The victim, who was six months pregnant, later suffered a miscarriage.
Following the attack, the victim was examined at Peekskill Community Hospital. One of the attending physicians, using a Johnson Rape Evidence Kit, collected fluid and hair samples. Police also retrieved the clothes worn by the victim during the crime for forensic testing.
The victim identified the man who raped her as the defendant. She claimed she was sure of the identification because defendant was a distant cousin of hers whom she had casually known for nearly nine years. She described defendant as a friend of her mother’s boyfriend and her sister’s boyfriend that periodically visited the mother and sister at her house, and she claimed to have seen defendant as recently as three to four months prior to the rape. She further testified that her attacker wore a black baseball cap with a "Playboy bunny” embroidered on the brim similar to one she had seen defendant wear on other occasions and that she recognized defendant by his distinctive laugh and the gaps in his smile. The alleged accomplices were never found.
*673 At the trial, in addition to the victim’s identification, the People introduced the results of the forensic evaluation of the physical evidence, but the results were inconclusive: Although semen was found on the victim’s underwear and on a gauze pad and slides from the Johnson Rape Evidence Kit, the prosecution was unable to show the semen belonged to defendant. Blood-grouping tests on a semen stain on the victim’s pants revealed the presence of two blood antigens "B” and "H”. Only the "H” antigen, however, was secreted by defendant.
One explanation for the presence of the "B” antigen offered by the prosecution was that the pants had been borrowed from the victim’s mother and that the semen could have been deposited on the pants at a different time. This possibility was suggested based on testimony by the victim’s mother that the mother might have had sexual intercourse during a time she had worn the pants prior to August 12, 1982.
Defendant maintained he was not the attacker and, in his defense, introduced testimony that he had worn his hair in a distinctive hairstyle — braided into "corn rows” — overlooked by the victim and that he had all his teeth contrary to the victim’s description. Defendant’s conviction nonetheless clearly rested on the jury’s crediting of the victim’s seemingly strong identification of defendant as someone she had previously known.
Following trial, certain of the physical evidence — cuttings from the victim’s underwear and pants, and the gauze pad— were frozen in storage at the Westchester County Department of Laboratories and Research. On November 21, 1990, the court granted defendant’s application to conduct DNA testing of this evidence (see, Matter of Dabbs v Vergari, 149 Misc 2d 844).
II
[The court’s discussion of the nature of DNA testing, its history and some of the concerns associated with its use has been omitted for purposes of publication.]
III
In this case, DNA testing of the gauze pad and the cutting from the victim’s pants eventually proved inconclusive because there was an insufficient amount of high molecular *674 weight human DNA. The piece of cloth from the victim’s underwear, however, which presented visible semen and partially degraded DNA, was found to be sufficient for comparison with DNA recovered from samples of blood from the defendant and the victim. As a result, Lifecodes claimed it was able to exclude defendant as the source of the semen. Based on these results, defendant moves to vacate the judgment of conviction.
CPL 440.10 (1) (g) provides that a court may vacate a judgment of conviction upon the ground that: "[n]cw evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to the defendant”.
Implicit in this standard is that the newly discovered evidence be admissible. Were the People to contest the admissibility of the DNA results, a hearing would appear to be required (see, CPL 440.30 [5]; see, e.g., People v Castro, 144 Misc 2d 956; People v Wesley, 140 Misc 2d 306). As the court observed in Castro (supra, at 960), "given the complexity of the DNA multisystem identification tests and the powerful impact that they may have on a jury” it is essential there be "a preliminary, critical examination of the actual testing procedures performed in a particular case.” Castro suggested a three-tier approach to admissibility: (1) determine whether the scientific community generally accepts the theory that DNA tests produce reliable results; (2) determine whether techniques currently exist in DNA testing that are generally accepted by the scientific community and which are capable of producing reliable results; and (3) determine whether the laboratory that performed the tests used these techniques in analyzing the samples in this case (People v Castro, supra, at 959-960; see also, United States v Two Bulls, 918 F2d 56, 59, 61 [adopting similar standard]).
Even assuming, arguendo, the first two issues are now sufficiently established by consensus within the scientific and legal community as to obviate the need for a hearing on those issues, the People would still be entitled to challenge the adequacy of Lifecodes’ laboratory procedures, methodology, and quality control generally and in this case specifically (People v Castro, supra; People v Wesley, supra). Indeed, such areas would seem especially relevant for inquiry given the size *675 and age of the sample, the possibility of the sample’s contamination and the fact that the sample was not preserved for the purpose of conducting DNA testing. The concern over population statistics, discussed above, would apparently not be an issue since there was no match of DNA found.
The People, however, have elected not to oppose defendant’s motion. At oral argument on the motion, it was even conceded the new evidence was material to the question of defendant’s guilt. The court surmises that this election is, at least in part, due to the fact Lifecodes is the same laboratory used by the People for DNA profiling in other cases. An attack on Life-codes’ methodology or its application here could undermine the People’s position in future cases that the laboratory’s DNA analysis should be admitted. Lifecodes incidentally is the laboratory used in most reported New York cases (People v Shi Fu Huang, 145 Misc 2d 513; People v Castro, supra; People v Wesley, supra; People v Gonzalez, NYLJ, Aug. 18, 1989, at 22, col 2; People v Lopez, NYLJ, Jan. 6, 1989, at 29, col 1) and the one chastised in Castro for laxness in its procedures (supra, 144 Misc 2d, at 977-978).
Under the circumstances, the court is constrained to assume that were the DNA results in this case submitted at a trial, they would be admitted to the jury without objection by either side. The effect of such an unqualified submission would have to be substantial (United States v Jakobetz, 747 F Supp 250, 263). As one court observed, "[t]here is no doubt a risk whenever scientific evidence is admitted that the jury will regard it with an 'aura of mystic infallibility’ * * * Arguably, DNA profiling is particularly capable — in more ways than one —of lulling a jury into slumbering at its post and not rigorously sifting the evidence” (United States v Jakobetz, supra, 747 F Supp, at 262; see, Note, The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant, 42 Stan L Rev 465, 466, 511-517 [1990] [arguing that juries have no ability to weigh DNA evidence]). The court, therefore, finds that defendant has met the standard for vacatur under CPL 440.10 (1) (g) based upon newly discovered evidence (see also, CPL 440.10 [5] [a]). The DNA analysis could not have been produced at trial with due diligence and it is of such character as to create a probability that had such evidence been received at trial the verdict would have been favorable to defendant because it would have strongly impeached the credibility of the victim’s identification. To have convicted defendant, the jury would either have had to discount the DNA analysis or ignore the victim’s statements of prior sexual *676 history — on the present record both remote possibilities.[2] Accordingly, the motion to vacate the judgment of conviction is granted (see, CPL 440.30 [3]).
[In a final portion of the opinion omitted for purposes of publication the court then granted the prosecution’s motion to dismiss the underlying indictment in the interests of justice based upon the reluctance of the victim to participate in a retrial. However, the court denied defendant’s request, in the alternative, to dismiss the indictment for legal insufficiency or because of a defect in the Grand Jury proceedings which requests were premised upon the theory that had the Grand Jury known of the DNA results it would not have indicted him or, if it had, that said indictment could not be considered to be supported by legally sufficient evidence.]
[Portions of opinion omitted for purposes of publication.]

. Ruling from the bench, the court orally granted defendant’s motion to vacate his conviction on July 31, 1991, and the People’s motion to dismiss the indictment on August 22, 1991. The court’s written decision here contains its formal findings of fact and conclusions of law in support of those rulings.

. Contrast this case with People v McSherry in the California trial court (Super Ct, LA County, Nov. 20, 1989) discussed in Levy, DNA Evidence in Criminal Cases: Legal Developments (NYLJ, Apr. 25, 1990, at 1, col 1). There, semen recovered from a rape victim was subjected to PCR analysis, but the defendant was convicted based upon eyewitness identification before the testing was completed. The results eventually exculpated defendant and defendant moved for a retrial. The motion, which was opposed, was denied based on affidavits by experts "expressing the view that the PCR test had falsely exculpated the defendant and implicitly questioning the readiness of PCR for use in the forensic setting as opposed to use in clinical settings for medical and biological research” (id., at 6, col 6). The court ruled the new evidence too new and open to question to infer the jury would have reached a different verdict. A new trial based on DNA evidence was also denied in Yorke v State (315 Md 578, 556 A2d 230 [1989]) where DNA testing was not necessarily exculpatory because the victim, unlike here, testified to being sexually active shortly before the rape.