OPINION OF THE COURT
Laura Visitación-Lewis, J.
Following his arrest on November 29, 1999, defendant Paris Drake was indicted on charges of attempted murder (Penal Law §§ 110.00, 125.25 [1]), assault in the first degree (Penal Law § 120.10 [1]), criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]), and related felonies. The charges stemmed from an incident in which a young woman was struck on the head with a brick as she walked in midtown Manhattan on the afternoon of November 16, 1999.
Prior to the commencement of jury selection, an application was made by the Assistant District Attorney to permit the complainant to attend the trial following her testimony as the People’s first witness. In an unrelated application, the defendant moved to allow the testimony of an expert witness in the field of eyewitness identification. Each side opposed the other’s motions and, following oral argument, I granted the relief requested by both. The following writing sets forth my reasoning.[1]
The Expert Witness on Identification
Originally, dependent upon the narrow inquiry of whether the jury’s determination would require “professional or scientific knowledge or skill not within the range of ordinary train *212 ing or intelligence” (Dougherty v Milliken, 163 NY 527, 533 [1900]), the standard for admissibility of expert testimony has evolved to permit more liberal application. Thus, in De Long v County of Erie (60 NY2d 296, 307 [1983]), the Court of Appeals recognized as “[t]he guiding principle” that an expert’s testimony would be properly received to “help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror” (emphasis added). Similarly, the Court in People v Cronin (60 NY2d 430, 433 [1983]) noted that the trial court must, as a preliminary matter, determine if jurors “would be benefited by the specialized knowledge of an expert witness” (emphasis added). (See also People v Keindl, 68 NY2d 410, 422 [1986]; Prince, Richardson on Evidence § 7-301 [Farrell 11th ed 1995].) The court must further determine whether the “potential value of the evidence is outweighed by the possibility of undue prejudice * * * or interference with the province of the jury.” (People v Bennett, 79 NY2d 464, 473 [1992]; see People v Taylor, 75 NY2d 277, 292 [1990].) The ultimate decision of whether an expert’s testimony will be admitted is a mixed question of law and fact left to the sound discretion of the trial court. (People v Cronin, 60 NY2d at 433; Selkowitz v County of Nassau, 45 NY2d 97, 101-102 [1978].)
This inquiry is fact-specific, requiring examination of the particular circumstances presented, and the degree of common experience that the jurors would be likely to possess. If the subject is one about which jurors have some general understanding, expert testimony may nevertheless be properly received to dispel misconceptions or to explain unusual behavior. (See, e.g., People v Taylor, 75 NY2d 277 [patterns of response exhibited by rape victims]; Matter of Nicole V., 71 NY2d 112 [1987] [dynamics of sexually abusive relationships within a family]; Selkowitz v County of Nassau, 45 NY2d 97 [proper police procedures in a high-speed chase]; People v Right, 180 AD2d 430, 431 [1st Dept], lv denied 79 NY2d 952 [1992] [pickpocketing methods].) In such cases, the expert testimony does not usurp or preempt the function of the jury, but, rather, serves to elucidate phenomena not commonly known, and to enhance understanding of that which is known.
Where, as here, the expert testimony sought to be introduced is in the field of eyewitness identification, there is a convergence of that which is “within the ken of the typical juror” (People v Cronin, 60 NY2d at 433), and the growing body of psychological research that has found increasing acceptance for its *213 designation of cognitive factors that may influence identification. (See People v Mooney, 76 NY2d 827, 832-833 [1990] [Kaye, J., dissenting].) This gives rise to the conflicting positions of the parties, for while it is true that identifying and recognizing other people is a common experience, the benefit of scientific expertise to clarify and explain psychological influences may, in certain circumstances, yield a better informed decision. (See People v Brooks, 128 Misc 2d 608, 619 [Westchester County Ct 1985].)
This is not to suggest that experts should be called in every case in which the defense of identification is raised. Common everyday experience will suffice to appreciate both that a brief encounter with a stranger in poor lighting significantly reduces a witness’s opportunity to perceive, and that the witness may nevertheless have had an adequate opportunity to view and accurately recall the person’s identifying characteristics. Where the circumstances are such that the experience of an ordinary juror will suffice to assess a witness’s ability to perceive and recall, the courts have precluded expert explanation. (See, e.g., People v Schor, 135 Misc 2d 636 [Dist Ct, Nassau County 1987]; People v Wong, 150 Misc 2d 554 [Sup Ct, Queens County 1991].)
In other identification cases, however, the jury can be greatly assisted by an expert’s explanation of factors that scientific research has shown can profoundly influence a witness’s ability to accurately identify. (See People v Mooney, 76 NY2d at 829-831, and authorities cited therein.) A representative list of such factors,, provided in People v Brooks (128 Misc 2d at 609), includes several that apply to the case at bar, as follows.[2]
First, the degree of violence and attendant stress of the event was especially great. Even in a city inured to violent crime, the sudden and unprovoked act of smashing a brick into the head of a woman as she waited in broad daylight to cross one of midtown’s busiest intersections was extremely shocking. The force of the blow was so tremendous that the unsuspecting victim instantly collapsed, unconscious, in a pool of blood and *214 urine. The entire incident took seconds, and the attacker fled immediately. Adding to the horror and trauma of witnessing an unanticipated event of violence in a normally safe environment was the use of a weapon. Moreover, the very type of weapon used was jarring; unlike the frightening but commonplace gun or knife, this was a type of force not readily comprehensible.
Studies have demonstrated that the factors of extreme stress, great surprise, and “weapons focus” may each be significant in affecting a viewer’s ability to both perceive and recall information. (See People v Mooney, 76 NY2d at 831; People v Beckford, 141 Misc 2d 71, 74 [Sup Ct, Kings County 1988].) Their combined effect may have an even greater impact, and the expert’s discussion of the scientific studies on selectivity of perception and weapons focus could aid the jury’s evaluation, particularly in light of the common assumption that awareness is heightened, and unusual circumstances are more readily recalled, in stressful situations.
Of equal, or perhaps greater, concern with respect to the accuracy of a witness’s recall, are factors outside the actual event. These include high media attention, which invokes the factors known as assimilation of postevent information, filling-in phenomenon, and motivation — both of witnesses to make an identification, and of police to make an arrest. Each of these individual factors may in turn be influenced by another, the delay between the event and the identification.
Here, the intense media attention generated by the crime raises the issue of pressure upon witnesses to make an identification, and upon the police to make an arrest. In addition, the passage of time during which the news coverage continued unabated increases the potential for witness assimilation of postevent information. The import of expert testimony with respect to this latter factor derives from research demonstrating that “a witness can unconsciously incorporate post-event information which will alter the original memory.” (People v Beckford, 141 Misc 2d at 75, citing Abney, Expert Testimony and Eyewitness Identification, 91 Case & Comment 28 [Mar.-Apr. 1986].)
In a related vein, psychological research has revealed that there can be a lack of correlation between a witness’s confidence and the reliability of the identification. (See People v Mooney, 76 NY2d at 831-832.) The advent of DNA testing and its acceptance as a reliable evidentiary tool (see People v Wesley, 83 NY2d 417, 421 [1994]; People v Rush, 165 Misc 2d 821 [Sup Ct, *215 Kings County 1995], affd 242 AD2d 108 [2d Dept 1998]) has made it possible to test this scientifically. (See, e.g., People v Dabbs, 154 Misc 2d 671 [Sup Ct, Westchester County 1991].)
Finally, the cross-racial aspect of the identification, i.e., that the two identifying witnesses are Caucasian and the defendant is African-American, is relevant in light of the cumulative effect of the aforenoted factors and the initial police focus on a particular mentally ill, homeless person who resembled defendant. Also taken into account in this regard is the inability of a number of eyewitnesses to select defendant in the lineup.
Based upon the combination of circumstances presented, I conclude that this case is one in which expert testimony will benefit the jury by providing the framework for it to evaluate the accuracy and reliability of the eyewitness testimony. To prevent any possibility that the expert testimony will infringe upon the jury’s fact-finding function, the witness will not be permitted to give opinion testimony regarding the credibility or reliability of any witness. In addition, the expert may not opine as to whether any of the specific psychological factors outlined above actually influenced the identifications. In short, the testimony of the expert is limited to setting forth the relevant psychological factors and interpreting the research data that demonstrate an effect on memory and perception. The prosecution may, of course, present its own expert in refutation.
The Complainant’s Attendance at Trial
As a general rule, the practice of excluding or sequestering witnesses “to guard against the possibility of * * * conforming their testimony to that of other witnesses” (Prince, Richardson on Evidence § 6-203, at 352-353 [Farrell 11th ed 1995]) “is a time-honored one and should not be abandoned.” (Charles v United States, 215 F2d 825, 827 [9th Cir 1954].) This is particularly true “where the testimony of the witnesses is in any measure cumulative or corroborative.” (People v Felder, 39 AD2d 373, 380 [2d Dept 1972], affd 32 NY2d 747, appeal dismissed 414 US 948 [1973]; see also 6 Wigmore, Evidence § 1838 [Chadbourn rev ed 1976].) Thus, it has long been recognized that an application to exclude a witness during the testimony of other witnesses “should * * * be granted as [a matter] of course” or as “a matter of right like the right of cross-examination.” (People v Cooke, 292 NY 185, 191 [1944].)
While the denial of an application to put a particular witness “under the rule” (Charles v United States, 215 F2d at 827) is a “departure from proper practice” (People v M. J., 42 AD2d 717 *216 [2d Dept 1973]), such a determination is left to the sound discretion of the trial court. (People v Cooke, 292 NY at 191; Levine v Levine, 56 NY2d 42, 49-50 [1982]; People v Gifford, 2 AD2d 634 [3d Dept 1956].) Even when found to have been improvident, the court’s exercise of discretion will not be disturbed, absent a showing of prejudice to the movant. (People v Cooke, 292 NY at 190-191; People v Lloyde, 106 AD2d 405 [2d Dept 1984]; People v M. J., 42 AD2d 717; People v Leggett, 55 AD2d 990, 991 [3d Dept 1977].)
Where, as in the instant matter, the special needs of a victim are asserted, the rules governing exclusion must be carefully examined in the specific context of the individual case (see, e.g., People v Clemons, 78 NY2d 48, 52 [1991]), but will not lightly be subordinated. Thus, for example, while the right of a victim to attend related criminal proceedings in Federal court is set forth in the Victims’ Rights and Restitution Act of 1990, codified at 42 USC § 10606 (b) (4), the court must first determine that the victim’s testimony will not be “materially affected” by that of other witnesses. Indeed, under the Federal Rules of Evidence, all testifying witnesses are to be excluded from the courtroom at the request of a party or on the court’s own motion. (Fed Rules Evid rule 615.)
In moving to permit the victim to attend the trial of her accused assailant in the case at bar, the Assistant District Attorney emphasized that her head injuries had left the victim with no memory of the event, and she was, therefore, not a fact witness whose testimony was susceptible to influence by that of other witnesses. Rather, the complainant’s testimony would be limited to providing her last recollections immediately before the attack and describing the nature and degree of her injuries. It was further noted that the complainant would in any event be the first witness to testify, and that it was not possible that her limited testimony would be the subject of rebuttal. The application to permit the complainant to attend the entire trial, for which she would travel with her mother from Texas in order to testify, was also premised in the hope that the testimony of the eyewitnesses would serve not only to fill the void in her memory, but to enhance her psychological healing as she continued to struggle with the physical and neurological effects of her injuries.
The defense argued against the attendance of the complainant, asserting the general rule of exclusion of trial witnesses, and urging that the prejudicial effect of her daily presence before the jurors would deprive him of a fair trial.
*217 To the extent that barring the complainant from the trial after her testimony would not serve the purpose of exclusion— the prevention of tailored testimony — the defendant can claim no prejudice from the complainant’s attendance. (See People v Santana, 80 NY2d 92, 100 [1992] [presence of a nonfact witness does not frustrate the truth-seeking function of a trial]; Trans World Metals v Southwire Co., 769 F2d 902, 911 [2d Cir 1985] [denial of exclusion of a nonfact expert witness was not prejudicial, despite the witness’s subsequent recall in rebuttal of plaintiffs expert].)
With respect to the second basis for defendant’s opposition to complainant’s attendance, i.e., that prejudice would flow from the mere fact of her daily presence, two factors were considered. First, inquiry was made of the People to determine whether the physical appearance of the complainant was such that it could have an “inflammatory impact on the jury” and thus prejudice the defendant. (People v Pobliner, 32 NY2d 356, 369, 369-370 [1973], cert denied 416 US 905 [1974] [admissibility of photographs that “portray a gruesome spectacle and may tend to arouse passion and resentment against the defendant in the minds of the jury” is dependant upon probative value]; accord, People v Wood, 79 NY2d 958, 960 [1992].)
It was ascertained that, despite the serious brain injuries sustained by the complainant, which required installation of two metal plates to her skull, she had no visible scars and needed no medical or prosthetic devices. As of the time of the trial, the complainant’s hair had grown to cover the areas of her brain surgery, and she appeared unremarkable upon casual inspection.
The second consideration was whether the mere daily exposure to the victim throughout the trial would itself generate undue sympathy or cause the jurors to feel pressured. Given the close analogy of unrestricted trial attendance by family members of homicide victims — a presence which serves to remind the jurors of their loss — the trial attendance of an assault victim who survived without visible signs of injury cannot be deemed unduly prejudicial. Absent any emotional outbursts or inappropriate behavior, therefore, neither of these grounds would provide a basis for exclusion.
Finally, the competing interests that must be weighed in this application should be considered in the context of the widely held perception that the rights of victims are often unnecessarily subordinated to those of criminal defendants. Attempts to mitigate this sentiment have been made at both *218 Federal and State levels, with a view toward enhancing confidence in the criminal justice system and providing more effective redress to individual victims. This salutary result must, however, be obtained in accordance with due process, a fact acknowledged both in the Federal law (see 188 Misc 2d 210, 216, supra), and in the law of New York State.[3]
In the instant matter, the complainant has proffered substantive grounds for attendance that, when weighed against defendant’s unsupported claims of prejudice, must prevail. Simply stated, equity, public policy, and the absence of undue prejudice dictate that she be permitted to attend the trial.
Accordingly, the applications of the defense and the prosecution are granted to the extent indicated.

. Paris Drake was convicted after trial of assault in the first degree and criminal possession of a weapon in the third degree. On December 13, 2000, he was sentenced, as a second felony offender, to concurrent terms of 25 years and 3V2 to 7 years, respectively.

. The full, albeit nonexhaustive, list of factors in Brooks includes: (1) the delay between the event and the identification; (2) stress; (3) the violence of the situation; (4) assimilation of postevent information; (5) the cross-racial aspect of the identification; (6) the selectivity of perception; (7) the “filling in” phenomenon; (8) expectancy; (9) the effect of repeated viewings; (10) the lack of a correlation between confidence and reliability; (11) the motivation of the victim to make a correct identification; (12) the motivation of the police to make an arrest; (13) the introduction of suggestiveness through photo arrays; (14) the availability of a “zero option”; and (15) the effect of what a witness is told sifter an identification is made.

. Several bills have been proposed in the New York State Legislature in recent years, seeking to amend the Criminal Procedure Law to provide that a crime victim or her representative shall not only be permitted to attend the trial, but sit at the prosecutor’s table. (See, e.g., 1999 NY Assembly Bill A 4905.) Earlier bills to this effect, introduced annually since at least 1993, either stalled or lapsed in committee. A narrower proposal, 2001 New York Assembly Bill A 4399, would permit attendance generally, but only if the victim will not testify. Similar versions of this bill previously introduced have been held in committee.