Matter of Royan D. (2004 NY Slip Op 50238(U))

[*1]

Matter of Royan D.

2004 NY Slip Op 50238(U)

Decided on March 29, 2004

Family Court,Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 29, 2004

Family Court,Kings County
In the Matter of a Proceeding Under Article III of the Family Court Act ROYAN D. A Child Under the Age of 16 years Alleged to be a Juvenile Delinquent, Respondent.
Docket No. DXXXX/04

Catherine Riccards, Esq., for the Petitioner, Assistant Corporation Counsel, NYC Law Department, 350 Jay Street, Brooklyn, New York 11201
Gary Schoer, Esq., for the Respondent, 6800 Jericho Turnpike, Syosset, New York 11791

PAULA J. HEPNER, J.
Respondent orally moved pursuant to Sections 330.2, 332.1(7) and 332.2 of the Family Court Act to suppress identification testimony under United States v Wade (388 US 218 [1967]) and People v Dixon (85 NY2d 218 [1995]) on the grounds that the police-arranged identification procedures were unduly suggestive. The Court granted the Respondent's motion for a Wade hearing to challenge the admissibility of the identification.[FN1]
The suppression hearing was held on February 26 and March 4, 2004. The Presentment Agency offered the testimony of Detective Jamaine McCain and introduced into evidence a copy of the pre-printed Miranda warnings sheet read to the Respondent. Respondent offered into evidence the photo array and two photographs of the lineup used in the out-of-court identification procedures. The Respondent's mother, Patty D., testified on his behalf. At the close of the hearing, decision was reserved in order to give the Court an opportunity to review the testimony and to consider the points and authorities cited by counsel in their summations.
FINDINGS OF FACT
The Court, having had the unique opportunity to hear the testimony of the witnesses, observe their demeanor, and to assess their veracity, now makes the following findings of fact based on the material and relevant and credible evidence adduced.
Detective McCain interviewed Jamol J., his parents and the arresting officer, Peter Bernard, in connection with his investigation of a robbery that occurred on December 22, 2003 around 8:50 p.m. In the course of his interviews, Jamol J. told Detective McCain his cousin was involved in the robbery and Officer Bernard, who was the arresting officer, supplied the name of "Junior" D., this Respondent. Detective McCain directed Sergeant Pfeifer and another officer to go to 342 St. Johns Place, the address Jamol gave for his cousin Junior. Sergeant Pfeifer asked Respondent's mother for permission and three photos were taken of the Respondent. Detective McCain had no record of when Sergeant Pfeifer got back to the precinct and did not know if Sergeant Pfeifer had taken the photos anywhere else before coming back. Respondent's mother said a detective called her the next day and told her the photo was shown "to the man and he did [*2]not recognize your son."[FN2]
Detective McCain created a photo array with the Respondent's photo and five others from the precinct's files of "juveniles of similar likenesses such as haircut, facial structure and the approximate same age." When asked on cross-examination if he knew how old the males in the pictures were, Detective McCain said he did not. On cross-examination, he said he tried to select "young African-American males with low haircuts, with a somewhat dark complexion." Detective McCain assembled the pictures in a special NYPD form with pre-printed numbers from one to six underneath the rectangular cut-outs where the photos are to be affixed. The form also contains pre-printed instructions entitled "Photo Identification Procedure" on the overleaf. Instead of folding the form so the instructions and numbers would be visible, Detective McCain folded the form in the reverse so the instructions and numbers were on the inside.
Detective McCain called the complainant and told him he would be coming to show him pictures regarding the robbery. He did not tell the complainant that he had a suspect. On January 6, 2004, Detectives McCain and Perreira took the photo array to the complainant's house. Before displaying the photos to the complainant Detective McCain did not read the precautionary language printed in the instructions on the form.[FN3] Detective McCain put the photo array on living room table and told the complainant to look at the pictures and tell him if he recognized anyone within those photos. The complainant scanned the pictures for approximately twenty seconds and then pointed to the middle photo in the top row. Detective McCain asked him where he recognized the person from and the complainant said that it was the person who hit him in the head. Detective McCain asked the complainant to sign his name under the image he chose and then Detective McCain recorded the date (1/6/03) and the time (0235) underneath the signature. Realizing the time was incorrect, Detective McCain wrote "14" above the "02" and "put his initials on it to show he made a correction on the actual array." Detective McCain could not recall what he said to the complainant after the identification was made.
Because the complainant and the Respondent were strangers to each other, Detective McCain organized a second identification procedure (a lineup) on January 16, 2004 at 9:30 p.m. Detective McCain went to the Respondent's home and explained to his mother that during his investigation the complainant had picked out her son's photo from an array which he showed to her. Detective McCain brought the Respondent and his mother to the precinct. He explained the lineup procedure and told them if the Respondent was chosen he would be subsequently arrested and if he was not picked, he would be released to his mother. When they arrived at the precinct, Detective McCain put the Respondent and his mother upstairs in his office.
Detective McCain then went to pick up the complainant in Manhattan and bring him to the precinct in Brooklyn. At the time, Detective McCain told the complainant he was going to be viewing a lineup "to see if he could see the person who committed this crime against him." Detective McCain did not tell the complain-ant whether a suspect would be in the lineup or not. A friend of the complainant, Mr. Blythe, came along. When they arrived at the precinct, Detective McCain put the complainant and Mr. Blythe in his office. The complainant had to walk [*3]past the room where the Respondent and his mother were waiting to get to Detective McCain's office but the door to the room was closed. Either Detective Franklin or Detective Correro sat with the complainant while he waited.
Detective McCain then went to get fillers for the lineup with similar likenesses "relatively young, same race and someone the same size." He asked five teenagers involved in the pre-cinct's Youth Explorers Program to come to the lineup room where he explained the lineup process and gave them numbers.[FN4] Detective McCain asked the Respondent where he wanted to sit, what number he wanted to have and whether he wanted anybody in particular to sit next to him but he didn't respond. The Respondent chose position number two. Detective McCain gave each of the boys identical hats to neutralize the differences in their hairstyles. Detective McCain's partner was the only other person in the room during the lineup. She stood against the wall to the right of the seated participants closest to the person in position number six. Two photos were made to document the composition of the lineup and introduced into evidence.
 Once the boys were all seated in numerical order, Detective McCain went to get the complainant. Walking to and from the detective's office, the complainant had to pass by the room the Explorer's Club was using but Detective McCain did not know if the complainant saw any of the boys before the lineup. Detective McCain told him he would be viewing a lineup of six seated people holding numbers from one to six, that he would be looking through a two-way mirror and if he saw anyone he recognized, he should say the number the person is holding and what the person did to him rather than asking where he recognized the person from. Detective McCain did not tell the complainant that there might be no one in the lineup that he might recognize. Detective McCain took the complainant into a small corridor to view the lineup. The complainant stood in the corridor with Detective McCain and Lieutenant Colon and viewed the lineup through a 3-4' x 2' window pane. The complainant told Detective McCain that he recognized the person in the number two position and said that he hit him in head and robbed him.
CONCLUSIONS OF LAW
The Court, having reviewed the applicable judicial pre-cedents pertaining to the suppression issues at bar, now makes the following conclusions of law based upon the relevant, material and credible facts established at the suppression hearing.
 In a hearing to suppress identification testimony, the Presentment Agency has the burden of going forward to demonstrate the reasonableness of the police conduct and the lack of any undue suggestiveness (Stovall v Denno, 388 US 293, 301-302 [1967]; People v Malinsky, 15 NY2d 86, 91 [1965]). The Respondent has the ultimate burden of showing by a preponderance of the evidence that the identification procedures used were impermissibly suggestive and conducive to mistaken identification (People v Chipp, 75 NY2d 327, 335 [1990], cert denied 498 US 833 [1990]). If the respondent is successful in showing that the out-of-court identification was tainted, the burden shifts back to the Presentment Agency to demonstrate by clear and convincing evidence that there is an independent source other than the improper pretrial identification to make an in-court identifica-tion (People v Malloy, 55 NY2d 296, 300 [1982], cert denied 459 US 847 [1982]; People v Ballott, 20 NY2d 600 1[967]; People v McQueen, 170 AD 696 [2d Dept. 1991], lv denied 78 N.Y.2d 924 [1991]). Identification evidence must be suppressed when the procedures used were impermissibly suggestive because of "a very substantial likelihood of irreparable misidentification" (Simmons v United States, 390 US 377, 384 [1968]; People v Adams, 53 NY2d 241 [1981]; People v Jones, 125 AD2d 333 [2d Dept. 1986], appeal denied 69 NY2d 829 [1987]).
[*4]A. The Photo Array
A photographic array has been considered suggestive "where some characteristic of one picture draws the viewer's attention to it, indicating that the police have made a particular select-ion" (People v Robert a/k/a Evans, 184 AD2d 597, 598-599 [2d Dept. 1992], appeal denied 80 NY2d 929 [1992]). The manner in which a photographic array is assembled (People v Grate, 130 AD2d 590 [2d Dept. 1987], lv denied 70 NY2d 647 [1987]), or what the person viewing a photographic array is told may render the procedure suggestive (People v Sessing, 184 AD2d 600, 602-3 [2d Dept. 1992], lv denied 80 NY2d 909 [1992]). If the age, size or features of the individuals in the group are not comparable to those of the perpetrator, a viewer may eliminate some of the participants immediately from consideration and the functional size of the group will be reduced. For all of the following reasons the Court holds the photo array in this case was suggestive.
All of the subjects in the photo array were photographed facing forward against a white cement block wall background. There is nothing unique to the color or style of the clothing worn by Respondent or any of the other five boys. All of the subjects are clean-shaven and all have close-cropped haircuts. None of the photos have names, dates of birth or any other information noted on them. Of the six photos in the array, two depict males with much darker skin tones than the other four. Three depict males much older than the others. Of the four photos depicting males of similar skin tone, size, age and complexion, one of them appears to be significantly older and larger than the others. As a consequence, the functional size of the photo array shown to the complainant was reduced to three people, who were all positioned in the top row. This is an insufficient number for a fair comparison.
Each of the three males in the top row appear to be of the same age and build. Only the Respondent's photo is out of focus and while that could conceivably draw the viewer's attention to his picture as the likely perpetrator, it is as just as likely that the viewer would discount it because the features are not so distinguishable. However, the presence of the unfocused picture in the array raises a more serious issue. Detective McCain had two other photos of the Respondent and they were unmarked, in focus and one of them was a head shot. Detective McCain's decision to use the unfocused picture supports an inference that he did so to intentionally draw the viewer's attention to the Respondent.
Prior to asking the complainant to view the photo array, Detective McCain did not ask if any other detectives or police officers had interviewed him between December 22, 2003 and January 6, 2004 or whether he had been shown any single photo-graphs prior to January 6, 2004. Respondent's mother testified another officer told her the police took the photos to the hospital for the complainant to view.[FN5] This testimony is unrebutted since Detective McCain could not recall when the officer returned to the precinct with the photos and did not know if he had gone anywhere in the interim. Had Detective McCain inquired of Officer Pfeifer or the complainant, there would be no possibility that the photo identification had been corrupted in this way.
Respondent contends the manner in which the photo array was shown to the complainant was likely to produce a mistaken identi-fication as a result of Detective McCain's failure to follow the procedures printed on the NYPD form for conducting photo displays and read the precautionary statement to the complainant. The Respondent refers to cases in this and other jurisdictions where experts in behavioral and social sciences have testified about the relationship of psychological research findings on memory and perception to eyewitness identification procedures.
Few courts admitted this type of expert testimony before the Court of Appeals decided [*5]People v Lee (96 NY2d 157 [2001]).[FN6] After Lee, trial courts have been asked, with greater frequency, to entertain expert testimony describing these research studies, explaining their findings and demonstrating their application to the identification procedures before them.[FN7]The specific research that is relevant to the case at bar does not involve the more controversial aspects of the eyewitness identification literature in the more recent cases. Rather, it is limited to eyewitness identification errors attributable to the procedures used in lineups and photo arrays. Research studies have shown that the "instructions given to an individual at the time they make an eyewitness identification can potentially bias the results" and conclude that when a viewer is told the perpetrator may or may not be in a photographic or corporeal lineup, the viewer is less likely to make a false identification.[FN8] Second, these studies show that "the likelihood that an individual will make an inaccurate identification increases when there are relatively few fillers in the lineup who fit the description of the perpetrator."[FN9]
As an outgrowth of these studies, experts recommend warning eyewitnesses that the actual perpetrator may not be in the lineup, having all members of the lineup fit the verbal descrip-tion of the perpetrator given by the eyewitness and because of the "dynamic interaction between the person administering the lineup and the eyewitness" along with the "potential for inter-personal influence," assigning a person to conduct the identi-fication procedure who does not know which person in the lineup is the suspect (People v Alcime, 2002 WL 264371 (NY Sup.Ct.) citing Law and Human Behavior, Vol. 22, No. 6, 1998; "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads," by Gary L. Wells, Mark Small, [*6]et. al.).
Of all the data reported in the scientific literature having to do with the psychological processes and factors which influence memory and perception, within the psychological community these three conclusions are considered "scientifically valid" and are "generally accepted as reliable" (People v Wesley, 83 NY2d 417 [1994]) meaning "approved by the majority of the experts in the field."[FN10] It would seem that the New York City Police Department has accepted the validity of first and second recommendations and has implemented them since their PHOTO IDENTIFICATION PROCEDURE instructs law enforcement personnel to read a cautionary statement to all viewers about the presence or absence of the suspect and provides for the inclusion of only individuals similar in appearance to the suspect.[FN11]
B. The Lineup
As a general principle, "all of the participants in a lineup should have the same general physical characteristics as those of the suspect" (People v Christenson, 188 AD2d 659 [2nd Dept. 1992], lv denied 81 NY2d 968 [1992]) and the lineup stand-ins should be wearing a "common and similar apparel" (People v Buxton, 189 AD2d 996 [3rd Dept. 1993], lv denied 81 NY2d 1011 [1993]). However, there is no requirement that a "defendant in a lineup be surrounded by people nearly identical in appearance" (People v Chipp,75 NY2d 327; People v Graham, 283 AD2d 885 [3rd Dept. 2001]; People v Odum, 278 AD2d 344 [2d Dept. 2000], lv denied 96 NY2d 832 [2001]; People v Valentine, 272 AD2d 632 [2d Dept. 2000], lv. denied 95 NY2d 872 [2000]; People v Foster, 272 AD2d 410 [2d Dept. 2000], lv denied 95 NY2d 889 [2000]). A "totality of the circumstances" is the standard by which the court must review the composition of a lineup and determine whether there is sufficient similarity between the defendant and the stand-ins to preclude the likelihood that the defendant was singled out for identification (People v Wallace, 261 AD2d 493 [2d Dept. 1999]). For all of the following reasons the Court holds the lineup conducted in this case was suggestive.
In the lineup created by Detective McCain, all of the six participants were similarly attired and the baseball hats they wore eliminated any distinguishing hairstyles. As set forth in the testimony, the four of the participants were 3 to 7 years older than the Respondent, three of the participants were shorter in stature than the Respondent, two of them weighed 40-60 pounds more than the Respondent and two of the participants weighed 15-21 pounds less than the Respondent. While each of the youths were seated for the lineup, that did not minimize their height and weight differences because it was possible for the complainant to see the relative [*7]length of their legs and the relative size of their torsos. Three of the males were noticeably heavier and obviously older than the Respondent. As in the case of the photo array, the functional size of the lineup was reduced to three people. Because the only participant in the lineup who was resembled the Respondent both in height and weight was 18 years old, not eleven or twelve like the Respondent, "any identifica-tion that flows therefrom cannot be accepted" (People v Simon, 49 AD2d 517 [1st Dept. 1975]).
Detective McCain did not give the complainant a lineup instruction to the effect that the perpetrator may or may not be present at the time he viewed the six males in the interview room. The same research recommendations for how photo arrays should be displayed to an eyewitness pertain as well to how a lineup should be viewed. Therefore the absence of an admonishment is a factor to be concluding the lineup was suggestive.
DECISION
Based on a totality of the evidence, this Court finds the Presentment Agency has not met the burden of going forward to demonstrate the reasonableness of the police officers' actions and the lack of any suggestive conduct on the part of law enforcement personnel conducive to an irreparably mistaken identification. The Respondent has met his burden of showing by a preponderance of the evidence that both the photo array and the lineup identification procedures were impermissibly suggestive. Accordingly the motion to suppress each of these identifications as well as any in-court identification is granted.
Where an out-of-court identification is the product of a suggestive pretrial procedure, the complainant may still be permitted to make an in-court identification if an "independent source" can be shown (People v Gethers, 86 NY2d 159 [1995]; People v Campbell, 200 AD2d 624 [2d Dept. 1994] lv denied, 83 NY2d 869 [1994]). Inasmuch as the Presentment Agency offered no facts which would support a finding of independent source during the hearing and did not request a bifurcated hearing either on February 5, February 26 or March 5, 2004 the Court is unable to determine whether the taint of the initial illegality could be overcome by a showing of independent source to permit an in-court identification (People v Martinez, 37 NY2d 662 [1975]).
Dated: Brooklyn, New York
 March 29, 2004
E N T E R :
 
 PAULA J. HEPNER, J.F.C.
Decision Date: March 29, 2004
Footnotes

Footnote 1: Because Respondent was on remand the Law Guardian made an oral application for suppression hearings. The Presentment Agency consented to a hearing in regard to the first identification procedure (photo array) but not the second (lineup) as they maintained it was confirmatory. The Court ordered a hearing on both procedures.

Footnote 2: All quotations have been referenced to the transcripts in the original decision. Citations are omitted here for publication purposes.

Footnote 3: Paragraph three ("Showing Photo Display") of the pre-printed PHOTO IDENTIFICATION PROCEDURES contains guidelines for conducting the photo lineup. The form directs officers to read the following statement to each person who will view the array: "In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, mustaches may be easily changed. Also, photographs may not always depict the true complexion of a person. It may be lighter or darker than shown in the photograph. Pay no attention to any markings or numbers that may appear on the photograph or any other differences in the type or style of the photographs. When you have looked at all of the photographs, tell me whether you see the person who committed the crime."

Footnote 4: On January 16, 2004 the Respondent was "eleven or twelve years old, about 5'10" tall and weighed about 120 pounds." The lineup report identifies those who participated in this lineup and describes their ages, heights and weights. The ages for the five fillers were 18, 17, 16, 15 and 13. Two of the boys were 5'7" tall, one was 5'6" tall and two were 5'1" tall. The weights recorded for the five boys are 185, 163, 120, 105 and 99 pounds. 

Footnote 5: The Presentment Agency argues the mother's testimony is incredible and self-serving yet the accuracy of Respondent's mother's testimony that three pictures were taken of her son was confirmed by Detective McCain on cross-examination [Tr. of 3/5/04 at 27, lines 21 to 28, line 12] although on his direct, he maintained only one photo was taken. 

Footnote 6: People v Green, 151 Misc.2d 194 (Sup.Ct. New York Co.1991){testimony about the lack of any correlation between the "certainty" a witness expresses when making an identification and the "accuracy" of that identification; the impact of "stress" at the time of the initial perception on a witness's ability to later make a correct identification}; People v Beckford, 141 Misc2d 71, 75 [Sup.Ct. Kings Co. 1988]{testimony about the effect of "stress" on the ability to remember; the psychological effect of delay between the criminal event and the subsequent identification; the lack of correlation between a prospective witness's confidence and the accuracy of his/her recollection; the assimilation of post-event information, the effect of repeated viewings, and cross-racial identification}; People v Brooks, 128 Misc2d 609 [County Ct. Westchester Co. 1985]{testimony discussing the facts which scientific research has shown are relevant to determining whether a reliable eyewitness identification has been made}.

Footnote 7: People v Santiago, 769 NYS2d 874 [Sup.Ct. New York Co. 2003]{denied testimony about "weapon focus"; how police investigation factors could influence a lineup}; People v Radcliffe, 196 Misc2d 381 [Sup.Ct. Bronx Co. 2003] {allowed testimony about cross-racial identification}; People v Legrand, 196 Misc2d 179 [Sup.Ct. New York Co. 2002) {denied testimony about confidence-accuracy correlation, post-event information and confidence malleability, and "weapon focus"}; People v Taylor, 2002 WL 465094 (NY Sup.Ct.){denied testimony about the "simultaneous method of exhibiting photo arrays and lineups to potential trial witnesses [and] the categorical superiority of the double-blind, sequential format" for lineups}; People v Smith, 191 Misc2d 765 [Sup.Ct. New York Co. 2002]{denied testimony about perceptual, cognitive and social factors including stress, event violence, cross-racial impact, and exposure time as it affects the reliability and accuracy of eyewitness identification}; People v Trinidad, 188 Misc2d 324 [Sup.Ct. Kings Co. 2001]{denied testimony about scientific study of per-ception and memory}; People v Drake, 188 Misc.2d 210 (Sup.Ct. New York Co. 2001){allowed testimony setting forth the relevant psychological factors and interpreting the research data that demonstrate an effect on memory and perception}.

Footnote 8: In re Kashawn B., NYLJ March 18, 2002 at 25, col. 2.

Footnote 9: In re Kashawn B., NYLJ March 18, 2002 at 25, col. 2.

Footnote 10: Jonathan W. Schooler, Ph.D., a credentialed authority in the field of perception, memory, retention and retrieval of past events, described "the means by which the findings of research studies are given professional recognition in the psychological community. Research studies that are subjected to peer review and then published in professional journals eventually become the grist for literature reviews. Through literature reviews, it is possible to see how much uniformity there is in the research findings and determine whether there is consensus in the field to accept the conclusions as generally reliable. Additionally, surveys may be done of experts in the field by giving them various statements and asking them to say whether there is a research basis for the finding and whether they agree or disagree with the conclusion. The results are tabulated and if 70% or more agree with the conclusion, it is considered "generally reliable" and accepted within the community. A third means of determining whether research findings are generally accepted in the psychological community can be done by looking at the opinions of those with the most extensive research in the field and greatest respect among their peers and weighting their opinions disproportionately (In re Kashawn B., NYLJ March 18, 2002 at 25, col. 2).

Footnote 11: Paragraph two ("Similarity of Photos; Covering Suggestive Markings") of the pre-printed PHOTO IDENTIFICATION PROCEDURES specifies that "all photos should be of persons of similar physical make-up, sex, hair, race, age, weight or build, etc. There should be nothing in the photos that would make the suspect's photo stand out. If mugshots are used any suggestive markings must be covered."